May it please the Court, I am John Lopato for Barbara Sopkin, the assignee of the General Partner of Interlace LP through Lucra, the General Partner, the original General Partner. Ms. Sopkin is here with me in court today. She traveled from Europe, Your Honor. We are also bringing a derivative action on behalf of Interlace LP. Your Honor, we're here because the district court wrongly dismissed a complaint that we filed in September 2016 against the state receiver, the bankruptcy trustee, and three lawyers who assisted the state receiver in this unusual case. In 1998, a state court put Interlace LP into a receivership as an The principal inventor was Dr. Ken Fox, who at one time was a limited partner of Interlace LP. They had no real estate. They had no leases. They had no commercial property. They had these valuable medical device patents that were licensed to several companies in the United States and abroad. Throughout this receivership, Defendant Mendelson, the state court, later the bankruptcy trustee Gold, and the three lawyers we sued who were hired by Mendelson, Kathan, Toothman, and Traynor, they made numerous omissions and fiduciary breaches of how to manage and administer this patent-licensed rich company. Over ten years that this receivership lasted, likely the longest receivership in Virginia court history, they only collected $3.25 million when we alleged they should have collected $27 to $30 million in license fees from the licensees that had entered into contracts with them and through other companies that infringed on their patents by spinning off inventions in these medical devices, catheters that were really in violation of their patent. We sued under six counts. The first count was under the Virginia Business Civil Conspiracy Statute, which allows for an action when one or more persons operate to damage or hinder or impede a company. Secondly, count two was a legal malpractice action against Toothman, Traynor, and Kathan. Now, the district court judge stopped the legal malpractice action because he said Toothman, Traynor, and Kathan never directly represented Interlace, but we cited the cases from the Virginia Supreme Court that say there's a third-party beneficiary cause of action under Virginia legal malpractice law if the third-party beneficiary is identified and plainly anticipated. Here, Interlace was clearly the third-party beneficiary. The district court judge did not even talk about that third-party beneficiary theory at all. We also cited a successor management theory. After the receivership ended and the bankruptcy trustee was released, the former management of Interlace took over, including Ms. Hopkin, and reviewed what these lawyers had done to her limited partnership to this company. She had the right to bring a legal malpractice action against them. We pleaded that. The district judge did not discuss it at all. Notably, let me comment on the district court opinion. The district court opinion, almost always in a Rule 12b6 motion to dismiss, has the standard of review saying that the complaint is deemed truthful and inferences about allegations in the complaint will be drawn in the plaintiff's favor. Part of every district court decision on a 12b6 motion. Conspicuously absent here. This judge didn't mention that very venerable principle for his standard of review. He gave us... You certainly can't contend that. Failing to mention the standard does not constitute reversible error. Indeed, Your Honor. I'm pointing out that I'm going to review and summarize what we pleaded and how we weren't given any... Did the Virginia court hold that, here's the exact quote, Lucre presented no credible evidence demonstrating that it exists or is in fact the corporate general partner of Interlace? Your Honor, you're talking about the sham argument that Mendelsohn and the other defendants made... My question was, didn't the Virginia court hold that? A state trial court held that and reversed by the Virginia Court of Appeals in the Mardula case... In this case, was that standing ever reversed? Was that holding ever reversed in this case? In the case that we have in front of us today involving your client? The district court judge did not make any finding about collateral... I'll try again and then if you can't answer, it's fine. Did a Virginia state court in a holding that has not been reversed in this case, the case you're arguing today, hold Lucre presented no credible evidence demonstrating that it exists or is in fact the corporate general partner of Interlace? No, Your Honor, the answer is no. They allege that... I would just come up with those words from that opinion if they didn't exist. Your Honor, there was no opinion, the state court made a ruling when he entered the receivership that all companies created by Dr. Ken Fox are associated with Interlace, including Interlace, were shams. Then that sham issue went up to the Virginia Court of Appeals and in December 2000, in the Mardula case, the Mardula case said a court cannot make rulings about fraudulent transfers or shams unless the party creating the sham is before them, alleged to create the sham, and the sham entity created is before the court. The Mardula case from the Court of Appeals of Virginia said that as to White Star, for instance, they were never served, they were never before the state court. That was exactly the same for Lucre, for Interlace also. In the state court proceeding, there was never service on Interlace, which is a Georgia limited partnership, there was never service on Lucre, which was then in the British Virgin Islands, there was never service on Dr. Ken Fox, who had left the United States by then and would have had been served through the Hague Convention, and there was never service on, well, White Star is not a party. The defendants in this case have put in hundreds of pages of documents from the state court proceedings, and none even allege that attempts for service were made. In the district court in 2000, before the Court of Appeals ruled, the same district court judge, Hilton, had a White Star versus one of the patent licensure cases, and he repeated that sham finding from the state court judge, but that was before the Court of Appeals ruled. When we went before Judge Hilton at the beginning of this case, we reminded him of that. We said, you didn't have the benefit of the Court of Appeals pointing out that these parties had not been served and they were not subject to the jurisdiction of the court, and the sham ruling cannot stand. That is the reason the district court judge, in his opinion before this court, did not take up their sham argument at all. He accepted our standing and proceeded to evaluate the complaints on his merits. The sham argument is completely false. It cannot serve as race judicata or collateral estoppel or anything like that. We cited in our papers the Carithers v. Harra case from the Court of Appeals of Virginia. On page 406 of that decision, it's in the southeastern pagination, they say that when a trial court's judgment is voided because of lack of jurisdiction over the parties, which is the number one reason why to void a court's judgment, one of the rare reasons that a court's judgment can be voided, when collateral estoppel against the party that's still trying to assert it. These defendants should be subject to collateral estoppel of the Court of Appeals ruling in the Mardula case that when these parties are not before the judge, when they're not served, when they don't have jurisdiction over them, a sham ruling cannot stand. That's why the district court did not take that argument up in this case, even though he was familiar with it. My opposition, my opponents, the defendants, they make that their number one argument. Not Defendant Gold, but Defendants Mendelson, Toothman, Cathan, and Traynor. They make that number one argument that the state court... Are those three the lawyer defendants? Is that what those are? Mendelson's the state court receiver. Cathan, Toothman, and Traynor were the lawyer defendants. They were all hired by Mr. Mendelson and worked for him. Back to the counts. Back to the legal malpractice count. The count three was fiduciary negligence against receiver Mendelson. Count four was fiduciary negligence against chapter seven trustee Gold, and count five was wrongful interference with contract. We admit it's fiduciary breach can constitute the tort of interference with contract. Not a Virginia case that cites the restatement of torts, but outside law. We still believe that's fully pleaded. Remember, we're only at the pleading stage. We had another count six where we allege the violation of 1983, 42 U.S. Code 1983, because what the receiver and the defendants did here interfered with the constitutional patent rights. Patents are endowed by the Constitution, but we are not proceeding with that count. We're not appealing that because it has statute of limitations problems. Justice O'Connor questioned why the courts use a personal injury statute of limitation based on bodily injury. It's sort of the tradition, and we'd have to have the Supreme Court reverse that, so we're not proceeding with that. Let's first talk about timeliness. The district court judge got off track on the counts against the fiduciaries because he said a two-year catch-all statute of limitations in Virginia Code 801, 248 applies. How many counts were in your complaint? Six. We're proceeding with five. You've abandoned number six. Yes. Wouldn't you have done better concentrating on one or two? Your Honor, I believe they're all well pleaded and were not handled correctly by the district court judge. Okay, we'll go over them all then. I am. First, the district court judge dismissed the fiduciary counts because, first, on timeliness. He said a two-year statute of limitation applies, but he used Section 248 of the Virginia Code 801, 248, which is the catch-all when there's no other statute of limitations applicable. Late in the game, we now argue that the ten-year statute against court-appointed fiduciaries, I repeat, court-appointed fiduciaries of Virginia Code 801, 245 applies. We cited that in our papers. We cited the text of the statute, and we showed how it uses the word surcharge. This court has defined surcharge against fiduciaries and erisic cases in the most broadest terms possible. We said that that applies. Now, it wasn't mentioned in the briefing before the district court judge. We admit that. But statute of limitations So you say it should be ten years. Yes, and 801 And raise it in the district court. No, we didn't. So you've waived that. No, we did not waive it, Your Honor, for this reason. The standard for waiver from the Johnson case from the Supreme Court that we cite in our brief is that if we plead the facts and the status of the defendant, that satisfies pleading, and we don't have to supply the correct statute. Now this court hasn't had a case under Johnson from the Supreme Court, but we cite the several district court cases from this circuit that endorsed that. But more importantly, this case, this court, remember, two things. It's an affirmative defense. The defendants had the duty to come forward with the correct statute. They got it wrong. They used the common law fiduciary statute of limitations when there's a director versus shareholders versus directors, or employer versus employee for stealing a customer list, or things of that sort where common law fiduciaries imposed. There's no Virginia Supreme Court case on this, but we cited other cases, lower court cases from the circuit courts showing that this statute applies by its text when there's a But you didn't mention the statute. We did not mention that particular statutory section. But in the Singer case before this court, and both sides are citing this Singer case, in the Singer case, Where do you get the notion that it was the obligation of the defendants to essentially write your brief for you and mention a statute that you're placing so much emphasis on? Your Honor, at the district court, they had under Federal Rule of Procedure 8, they had the affirmative obligation. It's an affirmative defense. And they had the burden of proof by the preponderance of the evidence, and they came up with the wrong statute. That was exactly the issue. They asserted it was in the district court. It was two years. And the judge accepted it. You didn't say it's 10 years. Not at the district court, no, Your Honor. Now you come up here saying it's 10 years. We just didn't focus. There aren't a lot of cases reported in this area. But more importantly, we pleaded. We filed by a certain day. We filed in September 2016, and we pleaded the status of the defendants Mendelson and Gold as statutorily appointed fiduciaries. That invokes the statute. In the Singer case, the defendant was in the same situation we are now. The defendant didn't realize that the plaintiff had a fiduciary account that was going to succeed, and the fiduciary- Gold is the bankruptcy trustee? Yes. He's the federal bankruptcy trustee? Yes. The Chapter 7 trustee, yes. And he was involved in the case throughout and approved everything that Mendelson and the other lawyers did. But in the Singer case, the plaintiff had a fiduciary breach count sustained, and on appeal, the defendants raised statute of limitations against it, and the plaintiff said, you didn't raise that directly in the district court. And this court said that because the defendant filed a general answer raising statute of limitations as to all counts, that was sufficient. And they accepted the defendant's statute of limitations defense and dismissed that fiduciary count. We're in far stronger straits than we are. We filed by a certain day, and we set out the status of the defendant as a court-appointed fiduciary. Let me talk about the components, the elements that the district court shortchanged to sign, the fiduciary negligence that we pleaded. We pleaded, he said that we just pleaded that the defendants signed, they joined in quarterly reports to the court. Well, that was just a summary of what they did at the end. In 2008, Ms. Sopkin hired an attorney who came before the bankruptcy court and served these fiduciary breaches up to the bankruptcy court that Mendelson and the lawyers had done for almost 10 years on a silver platter. Let me go through them quickly. Not asserting bankruptcy code section 365 to abandon burdensome executory licensing contracts on interlaced domestic and U.S. and foreign licenses. Failing to file with the patent office a simple form that would have gotten a 17-month extension on a patent term. That was because at the front end of the patent, the FDA had delayed the issuance of a patent. This is automatic. It's routinely granted. That 17 months would have been an easy $1 million more in licensing fee. Participating in a very poor settlement with Spectranetics, the principal licensor, they settled the case for $200,000 and they let Spectranetics keep the patent and they didn't go after Spectranetics for spinning off and manufacturing similar devices that really infringed on this patent. The settlement was unreasonable? And that they let them keep the patent and they didn't go after them for infringing on their patent. Spectranetics manufactured similar devices and sold them independent of the patent license. Not pursuing a Spectra licensing, a Spectranetics licensing agreement. I'm not abrogating an earlier Spectranetics license agreement with Pilco. That was a predecessor to Interlace. In the litigation against Spectranetics, Mr. Mendelson and Mr. Toothman, his lawyer, pleaded that but they abandoned that. They failed to pursue other license opportunities with companies that were not paying proper royalties. They licensed this patent, sold the devices, and short-changed Interlace. That was Candela Lacer. They wasted $400,000 of Interlace money in... I think counsel, you've got some rebuttal time. Thank you, Your Honor. Mr. Drain. Thank you, Your Honor. May it please the court. I'm Bob Drain. I represent the Mendelson defendants and also Anne Cathan, one of the three attorney defendants. Mr. Lee represents another one of the attorney defendants, Madeline Trainor. You'll follow me. And Jonathan Toothman, the third attorney defendant, is appearing pro se in the case, will not be arguing and adopts our arguments. Judges, as I pointed out to Judge Hilton in the district court below, this case is like a law school exam where we've been asked to identify every conceivable jurisdictional, procedural, substantive defect in one of the most flawed complaints that anyone could dream up. I first, Judge Matz, want to answer your question, and that is no. No Virginia court, not the Court of Appeals or the Supreme Court, ever reversed any finding of the Arlington Circuit Court that Interlace and Lucre were jams. The Mardula case that Mr. Lopato keeps referring to did not at all reverse it, and I welcome the court to read the opinion. In the fact section of that opinion, it repeats the finding of the Arlington Circuit Court that those entities were found to be jams. The decision, that case, Mr. Mardula was an attorney, and that case was a narrow case on appeal from a finding of contempt. And in that case, in the companion case, the Glantz case, I think decided on the same day, the Court of Appeals reversed the findings of contempt against those two attorneys on the grounds stated mostly that the actions that they did were before entry of the injunction at issue. But for purposes of us today and to answer your question, that case did not, absolutely did not reverse or, as he said in his brief repudiate, the sham findings, which were repeated any number of times by the Virginia Court, by the Court of Appeals, by the District Court, by the Bankruptcy Court, and so that is an established fact. It was never reversed and that is a fact which is raised due to Cotta and collateral estoppel. By this lawsuit, Ms. Sopkin was trying to step in the shoes of those sham entities. She purports to be suing as the assignee of Lucre, which supposedly has a 2% interest in Interlace, both of which were found to be shams. And so she's trying to step into the shoes of those sham entities and then she relies on that purported interest to file this action attacking, collaterally attacking the final bankruptcy court, both of which long ago distributed all of Interlace's assets to the creditors without any appeal by Ms. Sopkin. Ms. Sopkin waited years to sue Special Receiver Mendelson's widow and a host of other defendants with a complaint, an amended complaint, that the District Court dismissed in its entirety as all defendants. It was in 1998, almost 20 years ago, that the court appointed Mr. Mendelson as Special Receiver and found that he had experience serving as Special Receiver in cases. The court then entered its order December 18, 1998, again finding those entities to be shams, finding that Dr. Fox and others had noticed, Mr. Lupato argues that no one was served. It said there were specific findings, again repeated, that there was actual notice to Dr. Fox and others as well as constructive notice by way of publication. And again, those findings were never appealed by Ms. Sopkin at all. As a matter of fact, she never even entered – Was there an appeal in that case at all? I'm sorry? I think the only appeals would have been the Mardila and the Glantz appeals. Is that what you're talking about? Right. That's right. The injunctions. That issue was appealed, nothing else. There was the issue involving White Star, whether they had to give up documents and whether they were in contempt, but not the core receivership. The receivership itself was never the subject of any appeal. And all of the decisions, importantly, of the court. Mr. Lupato argues as if the special receiver was off on a lark and there was no oversight by the court. Well, the court appointed Mr. Mendelson as special receiver, requiring him to file reports, and he filed reports. The district court below found that how can that be unlawful under their counts of conspiracy and wrongful interference and whatnot when the court has directed that he file reports. And the court, the Arlington Circuit Court, then approved the reports and approved all of his fees to the penny without any appeal and made – and approved settlements, approved distribution of assets. There were partial distribution of assets throughout. And then a final distribution. And the order – all of this is cited in the record. The order which, in effect, sets a deadline for filing claims in the receivership, as would typically be in bankruptcy, set a bar date, if you will, I think February 16, 2000. And it specifically said that any claims not filed by then would be null and void. And that anyone who did not file a claim would be forever barred. Ms. Sopkin never appeared in the Arlington Circuit Court, even though, again, everybody in the world had notice of that receivership. She never filed a claim. There were about 15 claims filed. There were something more than $3 million that was recovered. They can try to allege that they – it should have been $27 or $30 million recovered. But there were reports and the court – there were no objections to the report. And by the way, the court's order, in addition to setting a bar date for claims, also said that if anyone had any objections to the report, you had 10 days to file. And of course, no one, including Ms. Sopkin, ever filed any objection to the report, the report saying how much had been collected, what efforts had been made. The – so Ms. – at some point, the Bankruptcy Court – there was a Bankruptcy Court filing that was stayed. Ms. Sopkin, when the Bankruptcy Court eventually lifted the stay, at the end, it found Mr. Gold, the trustee, filed a motion to adopt the claims process. And Ms. Sopkin objected to that. And she objected based – claiming that the – Mr. Mendelson had not properly managed the receivership. That was denied. And she also – she filed – made at least three filings to the Bankruptcy Court complaining about Mr. Mendelson and complaining about Mr. Gold and complaining about the Arlington Circuit Court denying due process and whatnot, even though she never entered an appearance. And all of those complaints, if you will, were denied by the court, in effect saying that there was no – she hadn't presented any evidence that she even had an interest. And also, she filed – even though she hadn't filed a claim in the Arlington Circuit Court, she filed what she called a proof of interest in the Bankruptcy Court, claiming the very same interest that she – that's the predicate for this, i.e., the asinine of the 2 percent interest in interlacing. What year was that? She filed that in 2009 or 10. And what – So that was nine or ten years after the – after the – Right. Well, the receivership did go on for a number of years. The Bankruptcy Court, in its order adopting claims, goes through the history of it. And he explains that the final distribution order was in 2000, and the Bankruptcy Court says that in the ensuing years, Mr. Mendelson was, in effect, collecting royalties and collecting other assets. There's no complaint at all by the District Court as to anything Mr. Mendelson had done. So the longer this suit goes on, the more confused and convoluted it seems to become. And, you know, that's not necessarily wrong in and of itself, but I'm wondering, behind all this confusion and all this smoke and fog, is there any – you know, is there any to which they were entitled? And I kept looking and looking, and I said, is there – is there some underlying merit here that the court's system is shortchanging, and I just couldn't find it. Or it was just sort of confusion multiplied and geometrically expanded and litigation going on forever. And that's not in and of itself dispositive, but there has to be some substance behind it all. And the problem is, it's just – it's just churning. It's just churning, endless claims and endless theories and forfeitures and waivers and this problem and that problem. And you know, but where's the merit? Where's the beef? Well, the short answer is, there is no merit, there is no beef to Ms. Hopkins' claims and complaints. Again, she'd raised them before they were rejected. The courts, both courts, oversaw Mr. Mendelson in the receivership and the bankruptcy and approved all of his reports, all of his fees. And to – if I may, that proof of interest which she filed, she expressly withdrew it. When Mr. Gold objected to it, basically saying she didn't have an interest, couldn't show one, she had her own attorney. She's suing Mr. Mendelson's attorneys, but she had her own attorney who entered an appearance for her in the bankruptcy court. Attorney defendants didn't represent a special receiver and were approved by the courts and who approved the fees, but she withdrew that proof of interest with prejudice. That's in the title and that's three times, four times in that – What year was that? That was in 2010. And she withdrew her interest, not just the claim. And by the way, he's – Mr. Lopato argues in the brief, well, it was a limited claim. Well, under the – any claim he – if he didn't file a claim, it's forever barred. So – and besides, the claim that she had filed said past money and any future monies. But she withdrew that with prejudice, with prejudice. And then she brings a suit claiming the same interest. If I may, all the defendants in this case, we move to dismiss on 12B6 grounds. By the way, I don't think Mr. Lopato correctly summarized the district court's decision on count one conspiracy. It really – that wasn't on statute of limitations. That was on the fact that there was no allegation of any unlawful act, et cetera. But the district court's – there were multiple grounds for dismissal, including statute of limitations, on every count. And the – in addition to 12B6, all the defendants also raised standing, lack of standing. That wasn't the district court's decision. I did want to touch on that brief – granted the dismissal to you all. You won. You all made a claim for attorney's fees? Well, they're – that's not subject to appeal, but yes, we – I know. That's what I'm getting at. I'm sorry. He had – he's reserved ruling on that? That's correct. That doesn't affect your final decision aspect of jurisdiction here, does it? That's right. He asked the attorneys to submit a fee petition. That's not been ruled on. Correct. So we might have another appeal on that. This could be a – Let's see. This is a premature appeal. That's what I'm asking. Right. Well – You've asked for fee shifting here. You've asked if you – asked for some sort of sanctions or fee shifting. I mean, normally you have the American rule in a case like this.  Right. – of the attorneys' fee was if you asked for – Well – Right. We all filed motions – But there – I mean, under certain circumstances, there's a variation from the American rule, and I just wondered whether you'd seek – had sought to invoke that. Right. Well, we filed based on Rule 11 and also 1988 to the extent that Count 6 – Count 6, he has an appeal. – alleged civil rights. Excuse me? They have an appeal on Count 6. That's right.  And also, I – well, the district court has not issued a final – It has to be the district court. He still asserted it. He still asserted it. And he's not appealing to dismissal. That's right. But – so we have – we've also argued for standing. And I – if I may, in the event, hypothetically, that the court were to decide that – The judge did rule on standing. He did not rule on standing. There you go. But what I did want to say is that in the event that the court were to determine that the district court lacked standing, I think in this case, under these unique circumstances, the dismissal should and must be with prejudice. And I understand that typically, historically, a dismissal for lack of standing, a lack of subject matter jurisdiction, would be without prejudice. But again, here, where she voluntarily invoked jurisdiction of the federal court, said that she – excuse me, where she had – But there's no such thing as ruling to review. You want us to rule on standing in the first instance.  Is that what you're saying? I think the court – Judge Hilton didn't rule on standing, you said. We raised standing. I know you raised it, but he didn't rule on it. He threw it out on other grounds. Well, that's right. And if you were to affirm, then that'd be fine with the defense. I'm only – we were only accounting for the possibility that the court might – They say that you didn't – that Judge Hilton didn't rule on – in the context of the attorney malpractice, didn't rule on a theory of third-party beneficiary to third-party malpractice. Well, I think he did. They alleged a theory like that, and that Judge Hilton's order doesn't address that theory. Is there any substance to that? Well, I – Did Judge Hilton ignore that and not understand it? I think that by – It's frivolous. What's your position on that? I think by implication, he certainly denied it. It was raised – It's hard to read an opinion by implication. It's true that Judge Hilton's opinion does not expressly mention the third-party beneficiary. I will say – Is there such a theory in Virginia? Is there such a theory of attorney malpractice? In certain cases. Probability? In certain cases, but not this. The Copenhaver case and then the Thorson case would be the two Supreme Court of Virginia cases that recognize that in the proper circumstances, if you allege that there was a – you were specifically intended to be the beneficiary of an attorney-client relationship, well, that's not the case here. As a matter of fact, the orders of the court, including the order of the Arlington Circuit Court appointing Mendelsohn and approving his attorneys and all the reports, the court approving her – the attorney's fees. And again, she had her own counsel. How can she come in and say that she was – that there was a third-party beneficiary and she thought that these were her lawyers when she had her own lawyers going up against Mr. Mendelsohn's lawyer? I see my time's up. Thank you. Thank you. Mr. Lee? May it please the court, Matthew Lee on behalf of Appellee Madeline Traynor. Ms. Traynor is a member of the bar of this court and she is here today in attendance. To answer Judge King, your last question to Mr. Drame, the Virginia Supreme Court in Thorson recognized a third-party beneficiary status in a testamentary estate-attorney relationship. The Virginia General Assembly enacted 64.2520.1 in response to that decision vacating most of it. But there is an intended third-party beneficiary theory in legal malpractice in Virginia but it's limited to drafting of testamentary documents. It has never been expanded outside of that setting and by statute the Virginia General Assembly has taken back some of which the Virginia Supreme Court – You're saying that the theory doesn't apply here. It does not apply here. The statute narrative sufficiently doesn't apply here. Is that what you're saying? That would be my interpretation of the statute given the narrow decision that was made in Thorson which only applied to an attorney drafting testamentary documents committing malpractice. In response to that, the Virginia General Assembly enacted 64.2520.1 last year to take back some of that. And the Virginia law has never recognized an intended third-party beneficiary status outside of such an attorney-client relationship. That brings me to my second point. Virginia law – These claims are all brought under Virginia law. Virginia law has faithfully adhered to the strict privity requirement in the attorney-client relationship in attorney-client settings. And that is what attorneys Toothman, Cathan, and my client Madeline Traynor had with the special receiver in the Arlington County receivership. Their duty, their paramount duty, and their exclusive duty was to the receiver. It was not to Ms. Sopkin. It was not to a sham entity known as Lucra. It was not to a sham entity known as Interlakes. My client represented Mr. Mendelson with respect to the bankruptcy proceeding. And your honors can see within the docket, within the joint appendix, what she did. It was very limited. I would contend that the last act – So, A, we don't – There's no proof, there's no facts establishing an attorney-client relationship between my client and the plaintiff in this case. Secondly, the tortious interference contract claim and the conspiracy claim are flawed fundamentally as a matter of law. Under Virginia law, you cannot conspire with his principle or her principle. And this applies to both tortious interference claims and conspiracy claims. And I believe the cases are Fox v. Dease, Michigan Mutual v. Smoot. So, these – Not only is the legal malpractice claim flawed because there is no legal duty, the conspiracy and the tortious interference claims are also fundamentally flawed. All right. Thank you, sir. Thank you. Thank you, Your Honor. Richard Simpson, I'm here on behalf of the bankruptcy trustee defending gold. I'd like to look at the big picture and in particular respond to your question, Judge Wilkinson, about this being so complicated and growing and growing. It should have been very simple. Ms. Sopkin raised all of the same complaints she's making now in the context of the bankruptcy proceeding. And that is where they should have been raised and they should have been heard. What she's complaining about as to defending gold is post-petition, after the bankruptcy was filed and also as to Mendelson. All this conduct took place in the context of a receivership and then the bankruptcy. And as to my client, simply in the bankruptcy. She raised the complaints. She could have had them litigated. My client said the complaints are not – don't have merit and rather than litigate it, her petition or her complaint. The other thing about what happened in the bankruptcy that's so telling is that in this case, Ms. Sopkin is contending that these assets that were sold in the bankruptcy were worth $10 million. There was an auction that Mr. Gold, Trustee Gold conducted, the court conducted when he was trustee, to sell those assets. She bid $500 and was the back-up awardee of the sale. In other words, if the winning bidder did not come through, she could have purchased for $102,500. The fact that they were sold for $105,000 in an auction  says everything you need. What year was that? That would have been, I believe, that would have been 2010, Your Honor. 2010? Yes. She bid $102,000 on $10 million worth of assets or claims now it's worth $10 million? Yes, she claims now it's worth $10 million. She bid $102,500 in an auction in which she participated. And then $105,000 was approved by the bankruptcy court? Yes. The highest bid was $105,000. They went back and forth. The way this began was actually there was going to be a sale for $20,000, I believe, to Ms. Sopkin and the other bidder came in and complained about that and so the court ordered an auction and in a fair auction back and forth it went back and forth and it was sold for $105,000. If she thought it was worth $10 million that she contends, one can question why she didn't go above $102,500. But the key is, these are all complaints she raised them in 2008. It's in the context of the bankruptcy. Everything about this is about how a bankruptcy trustee or a receiver conducted a receivership or a bankruptcy. So the case really, it isn't complicated. It shouldn't be six counts. It's really, because as my client, the business conspiracy count, there's no business that is being affected here or that in the traditional context would have that toward or interference with contracts. The contracts in question are the debtors' contracts that are being administered in the bankruptcy. There's really one claim. It doesn't have any merit but there's one claim and the one claim is that the trustee and the receiver violated their duties in administering this bankruptcy to those proceedings. But if it hadn't been, it's a two-year statute of limitations. That's the catch-all. It's not a ten-year statute. First of all, as you indicated, it's way because it wasn't argued. But it's also wrong. How many years? How late was it? If the two-year statute applies, how late was it? A little over, well, at a minimum, a little over three years. Three years late. Yes, and let me explain. Everything she's complaining about was post-petition and we believe she could have brought the claims before the bankruptcy was over. But she has argued she couldn't do that. It's wrong but it doesn't matter. The final order, the final act of the trustee submitting his account, his final accounting was August 31st of 2011. The court closed, the bankruptcy court closed the bankruptcy on September 6th, 2011. This case was filed on September 8th, 2016. So it's five years and two days after the case was closed. And so whether it's a two-year statute or if those other claims were considered the interference with contract, those are all five years. Whether it's two or it's five years, it's expired giving the benefit of very substantial doubts as to when this claim could have been brought. And that is part of what I wanted to say which makes this so simple a case. It's a complicated factual mess in terms of the allegations but it's really simple. On the statute of limitations, it's really a two-year statute. Give the benefit of the doubt and it's five years and two days later. That's the end of it. The other thing that is the end of it as to my client is the Barton Doctrine. You simply cannot sue a bankruptcy trustee without approval of the bankruptcy court. Ms. Volpato, Ms. Sopkin in her briefs pretty much conceives that the Barton Doctrine applies. This court held in McDaniel that it applies broadly to any act within the context of the bankruptcy. Did they ask the bankruptcy court for permission to sue the trustee? They did not. And unless and until they were to ask the bankruptcy court for permission, they can't bring it. And the reason for it is to prevent exactly what we have here. It's for the bankruptcy court to act as a gatekeeper in two respects. One, to make sure that trustees are not burdened with meritless suits as we were here. And second... The nature of an immunity for the bankruptcy trustee. Yes, there's also an immunity which we've set forth in our briefs. Everything that Mr. Gold did was approved by the court. There are like ten reasons  Some of the simplest are the statute of limitations. The other point I wanted to mention I do believe the district court proceeded correctly with respect to the fees issue that you asked about, Judge Wilkinson, which was after deciding the case on the merits, Judge Shelton granted a Rule 11 motion finding there was a violation of Rule 11 but stayed for the proceedings pending completion of the appeal which I don't think I believe is procedurally proper on that collateral matter. And if this court were to reverse of course that would moot out Rule 11. But it was a sanctions award. It was after the court had decided the merits. And it was based on his finding that this was a frivolous lawsuit. And we and the other defendants did send letters per Rule 11 asking that this be voluntarily withdrawn and it was not. Unless there are any questions I respectfully request that the court affirm this. Thank you, Mr. Simpson. Thank you. Mr. Lopato. Your Honors, the sham argument must be put to rest. Mendelsohn, the state court receiver, filed ten years of federal income tax returns for Interlace. This wasn't a sham. Even though Interlace had never been properly served by the state court receiver. The sham argument should not control here. The district court judge prudently didn't take it up because we reminded him that the basis of the sham ruling was lacking in that there was never any jurisdiction of the state court over these parties. So it's an invalid judgment in the beginning and it can't be enforced now. The reason there was no challenges in the state court by Ms. Sopkin or anybody associated with Interlace is because the state court receiver was completely in control of the matter. An illustration of that is these two lawyers, Glanz and Mardula, that tried to make very limited appearances one for Lucra and Mardula who didn't even appear. He was just filing some papers in a patent licensing matter for White Star. He filed them in another court and they were called for contempt. Mendelsohn persuaded the state court judge to impose contempt on him for $400,000 of Interlace money pursuing a failed contempt proceeding. There was no one who could appeal the state court rulings. Mendelsohn was in complete control. Judge Wilkinson, it wasn't churning. This was a one-sided matter. This state court receiver had complete control of this. The bankruptcy court even deferred and said we'll let the state court receiver run the show until 2008. That's when the bankruptcy court got back in. The timing is important. We pleaded that in 1990 or in 2000 rather, right when the state receivership started, a lawyer for Dr. Fox wrote Mendelsohn's lawyer and said okay, you've taken over Interlace now. Here's what you have to do with the patents. One of them was to get this extension of patent term. File this easy form with the patent office and get 17 more months because of early FDA delay. That wasn't done. That's fiduciary negligence. Straightforward. That was early on. Let me comment on the auction. The auction is a complete distortion. The patents all expired by 2007. The big money in this case was early on in 2000, 2001, 2002. There's no auction value of anything to talk about. The patents had all expired by 2007. Counsel for Ms. Trainor in the legal malpractice matter did not cite that statute in their brief. They just cite about the testamentary intent. The legislature acted after we filed our complaint on the holdings of those two cases from the Virginia Supreme Court where the third party beneficiary of the legal representation is named and identified a cause of action for legal malpractice can proceed. All those items I mentioned that I read off, section 365 and so forth, they were discussed before the bankruptcy court but the bankruptcy court didn't reject them. We had a lawyer in 2008 and brought them to the attention of the bankruptcy court and listed them and we go into that in our reply brief and set it out in great detail and that's when the lawyer for Mendelson got up and said Ms. Sopkin doesn't exist. She's not here. We don't know who she is. We don't know if she really exists and those items never got acted on. Now let me talk about the court order. These fiduciaries did not have court approval to not take these patent standard of care actions. This case, this court has the famous leading case on fiduciary duty of Yadkin Valley from 1992. Mendelson doesn't even cite it in his brief but Gold does but there's two parts of that case. One says the trustee can get some immunity, get some protection if he seeks instructions from the court over a matter. They never did this. They knew about these patent issues. They were paying a patent lawyer on a contingent fee left over from earlier interlaced litigation in the Abelman firm. They could have hired him to review the patent portfolio early on and said see how we can maximize this. See how a skilled patent lawyer, patent licensing expert can do it. All those fee petitions they filed, all those reports they filed, none of them discuss anything at all. Claims is another myth. Mr. Gold, Mr. Simpson, or excuse me, Mr. Gold's lawyer and Mendelson's lawyer are proffering. These were claims against interlaced. We're talking about claims that should have been made on behalf of interlaced. That's what was omitted here. That's what Yadkin Valley says can be ordinary negligence. We cited U.S. Supreme Court cases and cases from other courts saying where a trustee doesn't get fire insurance for a building, where a trustee doesn't put money in an interest bearing account. That's simple. That's gross fiduciary negligence that he's fully liable for. I think we understand your claims. Is there anything else? Your Honor, I want to dispel the Barton Doctrine doesn't apply. 28 U.S. Code 959 says that you don't have to get leave to the court when the actions that you're challenging the trustee on pertain to carrying on the business of the debtor. That's exactly what we're doing. We also cited a case from a Louisiana bankruptcy judge that said this court has the power to excuse us going to the bankruptcy court. It's not necessary. They're not going to have to reopen the bankruptcy. They're not going to have to change any bankruptcy orders. We have a power to excuse what? To excuse us from having to go to the bankruptcy court. Even if we did have to go to the bankruptcy court, it would be very ministerial because of the reasons I said. The bankruptcy is closed. The debtors have all been paid. A new trustee will not have to be appointed. We will not have any reason to reorder the bankruptcy. Your Honors, when Gold responded to Ms. Sopkins' lawyers whistle blowing in 2008 on page 555 of the appendix, this is a very important footnote and we trumpet this in our brief. He acknowledged that in a patent situation, trustees and fiduciaries have a duty under Section 365 of the Bankruptcy Act to apply it to abrogate and get the debtor out of burdensome executory contracts. But he said, that was back in 1999 when the bankruptcy was first filed in Georgia, before I was involved. That's a $10 million admission because who was involved? Mendelsohn and his first bankruptcy lawyer, David Kathan were involved. The leading case on 365 for patents in the country is from this court, the Lubrosol case we cite. The Lubrosol case acknowledged that licensees that patent holders can be excused, they can abrogate licensing contracts. And the Congress then did a little repair and said that we'll limit that so that U.S. license holders of patents can choose to keep paying, push back and stay in the contract. But most of Interlace's patents were domestic. That should have been on the front page, the very top of the desk of any bankruptcy lawyer or any fiduciary who took over this Interlace patent portfolio because there were a number of patents  of Interlace's executory contracts with the main licensee Spectranetics. Please reverse this district court dismissal. These counts were well pleaded and deserve to be heard and reversed and remanded. Thank you. Thank you. We'll come down and read counsel and then we'll move directly into our next case.
judges: J. Harvie Wilkinson III, Diana Gribbon Motz, Robert B. King